UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

JASON SETH PERRY,                              )
                                               )
                    Plaintiff,                 )
                                               )
            v.                                 )        No. 1:17-cv-00197-JMS-TAB
                                               )
MARY RUTH SIMS Ph.D., HSPP, et al.,            )
                                               )
                    Defendants.                )

**Order Discussing Cross-Motions for Summary Judgment**

Plaintiff Jason Perry, an inmate of the Indiana Department of Correction (IDOC), brought

this action pursuant 42 U.S.C. § 1983 because he was subjected to involuntary injections of an

anti-psychotic medication known as Haldol. He sues the medical professionals he believes were

responsible for this decision, Daniel Rippetoe, Mary Ann Chavez, Mary Ruth Sims, Lisa Robtoy,[1]

and Brion Bertsch, and the prison official who reviewed the decision, Michael Mitcheff. Mr. Perry

contends that the decision to involuntarily medicate him violated his Fourteenth Amendment right

to due process. He further contends that the defendants exhibited deliberate indifference to his

serious medical needs in violation of the Eighth Amendment because he experienced an allergic

reaction to the medication. Mr. Perry and the defendants seek summary judgment on these claims.[2]

---

[1] Formerly known as Lisa Isberg. This defendant will be referred to as Robtoy throughout this
Order.

[2] Mr. Perry appears to the object to the defendants' filing cross-motions for summary judgment
because this procedure was not contemplated by the Case Management Plan as required by Local
Rule 16-1(b). But this case is exempt from the Case Management Plan requirement. Local Rule
16-1(g)(3). The fact that cross-motions for summary judgment were not contemplated in the
Entry Setting Pretrial Schedule does not mean that they are improper.

For the following reasons, Perry's motion for summary judgment is **denied** and the defendants' motions for summary judgment are **granted**.

## I. Summary Judgment Standard

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Williams v. Brooks*, 809 F.3d 936, 941-42 (7th Cir. 2016). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome-determinative. *Montgomery v. American Airlines Inc.*, 626 F.3d 382, 389 (7th Cir. 2010). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Gekas v. Vasilades*, 814 F.3d 890, 896 (7th Cir. 2016). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has repeatedly assured the district courts that they are not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion before them. *Grant v. Trustees of Indiana University,* 870 F.3d 562, 573-74 (7th Cir. 2017).

The existence of cross-motions for summary judgment does not imply that there are no genuine issues of material fact. *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Engineers, Local Union 150, AFL-CIO*, 335 F.3d 643, 647 (7th Cir. 2003).

## II. Facts

The following statement of facts has been gathered from the parties' cross-motions for summary judgment. These facts are considered to be undisputed for purposes of the motions for summary judgment except where the Court has identified disputes of fact.

<u>IDOC Policy on Involuntary Administration of Anti-Psychotic Medications</u>

The procedure for administering involuntary anti-psychotic medications is set forth in IDOC Health Care Service Directive 4.10, "Involuntary Psychotropic Medication Administration." *See* Dkt. 175-7, ¶ 9; Dkt. 175-4. The stated purpose of this policy is to provide "the procedures for administration of psychotropic medications without the offender's consent when the offender is either gravely disabled or poses a likelihood of serious harm to self or others

due to a mental disorder." Dkt. 175-4. An inmate "has a right to refuse psychotropic medications unless . . . A psychiatrist has determined that:

- [t]he individual suffers from a mental illness or disorder **and**
- the medication is in the best interest of the individual for medical reasons **and**
- the individual is . . . gravely disabled or exhibits severe deterioration in routine functioning or poses a likelihood of serious harm to himself or others or the property of others."

*Id.* Gravely disabled, mentally disordered offenders who require non-emergency medication to prevent severe deterioration in routine functioning and do not consent to treatment will be provided a due process hearing before the medication is administered. *Id.* This hearing will be conducted by a Medical Treatment Review Committee to review the documentation which explains the need to initiate and/or continue involuntary psychotropic medication orders. *Id.*

The medical treatment review committee panel is comprised of three or more members. *Id.* The facility's lead psychologist shall serve as chairperson of the committee. *Id.* At least two of the members must be physicians (one of whom must be a psychiatrist). *Id.* The committee members must not have been the treating psychiatrist who prescribed the proposed medication. *Id.* Members are not disqualified from sitting on the committee if they have treated or diagnosed the offender in the past. *Id.*

"The offender has the right to attend the hearing, to present evidence, including witnesses, and to cross-examine staff witnesses unless the offender's attendance at the hearing poses a substantial risk of serious physical or emotional harm to self or poses a threat to the safety of others. The assisting staff member will appear at the hearing on the offender's behalf …. The assisting staff member will specifically ask (at least) the following questions:

1 Please summarize the evidence for serious mental illness, including the specific psychiatric disorder thought to be present:

2 Please explain why the psychiatrist believes that the recommended medication is in the patient's best interest, including specific goals for treatment:

3 Please summarize the evidence for grave disability; severe deterioration in routine functioning; or the likelihood of serious harm to self, others, or property of others.

4 Please describe what other interventions might serve to treat this patient.

*Id.* Before the hearing, the inmate and his assisting staff member may request in writing that certain staff witnesses be present at the hearing or that specific questions be asked outside of the hearing and that certain information be available at the hearing. *Id.* At the hearing the offender will be assisted by the appointed staff member and may make statements and present relevant documents. *Id.* They may also direct relevant questions to staff witnesses. *Id.*

<u>Perry's Mental Health Background</u>

Perry's medical records reflect that he was evaluated on May 21, 2014, at the Reception Diagnostic Center (RDC) in Plainfield, Indiana after his most recent conviction and 70-year sentence on a charge of murder. Dkt. 175-5, ¶ 12. RDC is an intake facility where inmates are interviewed and evaluated for classification and housing. Upon his entry into RDC, Perry was examined by Rippetoe for an initial intake psychiatric evaluation. Dkt. 175-5, ¶ 8. Perry stated that he had attempted suicide two times in 2013 when he was about to be arrested for the crime for which he is currently incarcerated. *Id.* He reported that since age seventeen he had experienced hearing voices. He also stated that he believed the television was talking about him and that other people knew what he was thinking. *Id.* He stated that he continued to hallucinate, but that the voices did not bother him. *Id.* He stated that he had been hospitalized at age thirteen at Bloomington Meadows Hospital for disorganized thinking. *Id.* He stated that he had been diagnosed with paranoid schizophrenia and depression. *Id.* His past medications included Haldol (haloperidol) (an anti-psychotic), Celexa (an anti-depressant), Risperdal (an anti-psychotic),

Thorazine (an anti-psychotic), Wellbutrin (an anti-depressant), Zyprexa (olanzapine) (an anti-psychotic), Zoloft (an anti-depressant), and Paxil (an anti-depressant). *Id*. Perry states that Dr. Rippetoe told him the he did not need to take medications. Dkt. 196, ¶ 29.

Haldol

Haloperidol, marketed under the trade name "Haldol" among others, is an anti-psychotic medication that works by helping to restore the balance of certain natural substances in the brain (neurotransmitters). Dkt. 175-1, ¶ 31. It may be used by mouth, as an injection into a muscle, or intravenously. *Id.* Haldol can be prescribed to treat certain mental/mood disorders such as schizophrenia and related disorders. *Id.* It can also help prevent suicide in people who are likely to harm themselves. *Id.* A long-acting formulation of Haldol may be used as an injection for people with schizophrenia or related illnesses, who either forget or refuse to take the medication by mouth. *Id.* It is the most commonly used anti-psychotic. *Id.* Signs of an allergic reaction include rash, itching, swelling, difficulty breathing, and severe dizziness. *Id.* Many cases of a reported "allergy" to Haldol are actually complaints regarding common side effects of the drug such as dystonia (spasms and muscle contractions), akathisia (motor restlessness), parkinsonism (characteristic symptoms such as rigidity), bradykinesia (slowness of movement), tremor, and tardive dyskinesia (irregular, jerky movements). These symptoms are collectively referred to as extrapyramidal symptoms ("EPS"). *Id.* Commonly used medications to address EPS are benztropine (Cogentin), or diphenhydramine (Benadryl). These medications reverse the symptoms of EPS and are often prescribed along with Haldol. *Id.*

Perry states that Haldol was listed as an allergy on his medical records. Dkt. 168, ¶ 4. He states that he was never given an allergy test. Dkt. 196, ¶ 20. According to the defendants, the listing of Haldol as an allergy in Perry's medical records while he was at Wabash Valley was based

on his self-reporting that he was allergic to that medication. Dkt. 175-1, ¶ 68. They assert that mental health professionals are accustomed to patients stating that they are "allergic" to certain medications when they are actually experiencing unpleasant side effects. *Id.*

<u>Recommendation to Medicate Perry with Haldol</u>

On May 20, 2016, Perry was seen by a mental health provider at Wabash Valley for reported mental health concerns while he was in restrictive housing. Dkt. 175-1, ¶ 15; Dkt. 175-2, pg. 1. He expressed paranoia, stating he believed that his legal mail was being thrown away. *Id.* He denied thoughts of suicide but admitted passive thoughts of self-harm due to being placed in segregation for a behavioral write-up. *Id.*

On May 23, 2016, Perry was moved from the restrictive housing unit at Wabash Valley to the Closed Custody Unit (CCU). Dkt. 175-1, ¶ 16; Dkt. 175-2, pg. 3. On June 7, 2016, Perry was seen by Dr. Mannarino to assist in appropriate housing placement. Dkt. 175-1, ¶ 17. Perry stated that he understood that his request for protective custody had been denied by IDOC custody staff and that his claims regarding his reasons for requesting protective custody had not been substantiated. *Id.* Dr. Mannarino referred Perry to the staff psychiatrist. *Id.*

On June 14, 2016, Perry refused to be seen for his psychiatric referral. *Id.*, ¶ 18; Dkt. 175-2, pg 17-23. On June 20, 2016, Perry again refused to be seen for his psychiatric referral. *Id.*

On June 28, 2016, Perry was seen for a medication management visit by Dr. Mannarino. Dkt. 175-1, ¶ 19. Dr. Mannarino noted that there were no apparent mental health contra-indications for Perry to be housed in the restricted housing area.

On June 28, 2016, Perry was seen by Bertsch for a medication management visit. Dkt. 175-1, ¶ 20; Dkt. 175-2, pg. 31-34. Bertsch noted Perry had been prescribed Nortriptyline, an anti-depressant, but Perry stated, "It doesn't work, I bet I don't even take it 96% of the time." *Id.*

Bertsch reminded Perry that a medication has to be taken consistently as prescribed before it can be said that it does not work. *Id.* Perry asked specifically to be prescribed bupropion (Wellbutrin), a different anti-depressant. *Id.* Bertsch informed him that he had exhibited symptoms of anxiety which contra-indicated bupropion. Perry then became agitated and began speaking of a conspiracy against him since he had arrived at Wabash Valley. *Id.* He believed he had been singled out for behavior violation write-ups and stated, "that just goes to show that you want to put me on a drug that will slow me down and make me vulnerable to attack, you're trying to get me killed." *Id.* Bertsch discussed symptoms and treatment for paranoia with Perry. *Id.* He recommended a trial of the anti-psychotic ziprasidone (Geodon) which Perry refused. *Id.* Perry also requested that his Nortriptyline be discontinued as he was not taking it. *Id.* Bertsch noted Perry to be defensive, anxious, mistrustful and demanding with poor insight, poor judgment, and making minimal progress in addressing his mental health diagnoses. *Id.*

On July 1, 2016, Rippetoe interviewed Perry by teleconference. Dkt. 175-5, ¶ 11; Dkt. 175-2, pg. 35-37. Rippetoe noted that Perry was serving a 70-year sentence on a murder conviction and believed his victim's mother was trying to "get to him" while he was incarcerated. *Id.* He stated he also believed other inmates were following him on Facebook. *Id.* He did not want to be on anti-psychotic medication even though he admitted he had a past schizophrenia diagnosis. *Id.* Perry was agitated and demanded to be given Remeron, an anti-depressant. *Id.* Perry indicated he was allergic to Haldol. *Id.* Rippetoe did not prescribe mental health medication, but he noted that he would discuss Perry's condition with the on-site mental health team at Wabash Valley and refer Perry to the on-site psychiatrist about safety concerns which might indicate involuntary medications. *Id.*

On July 5, 2016, Perry's mother, Kelley Schneider, called Wabash Valley and spoke with Sims. Dkt. 175-1, ¶ 22; Dkt. 175-1, pg. 38-39. Ms. Schneider reported that Perry had written her that he would kill himself if he did not receive protective custody status from the IDOC. *Id.* After obtaining a signed release from Perry, Sims spoke with Ms. Schneider who reported that she believed her son was "paranoid schizophrenic because he 'always thinks people are after him' and 'he talks to people not there.'" *Id.* She said he had exhibited these symptoms since age 16 or 17. *Id.*

On July 6, 2016, Perry submitted a Request for Health Care ("RFHC") stating that he wanted to be placed back on Celexa for depression. Dkt. 175-2, pg. 473. In the RFHC, he stated that he "fights suicide daily" and that he believed his mental health treatment was being neglected. *Id.* On July 7, 2016, Perry again refused to be seen by his mental health provider. Dkt. 175-1, ¶ 23; Dkt. 175-2, pg. 40.

On July 18, 2016, Perry was seen by Bertsch for a psychiatry follow-up and assessment for involuntary medication. Dkt. 175-1, ¶ 25; Dkt. 175-2 pg. 44-46. Dr. Bertsch discussed with Perry the benefits and side effects of ziprasidone, benztropine, and buspirone. *Id.* Perry signed a consent for treatment with medication. *Id.* Dr. Bertsch then submitted a request for the non-formulary medication buspirone, as Perry believed buspirone made him less anxious and able to think more clearly. *Id.* Dr. Bertsch assessed Perry for involuntary medications, but Perry agreed to try ziprasidone (Geodon), an anti-psychotic in pill form, first. *Id.*

On July 23, 2016, Perry submitted a RFHC stating that he had agreed to take the anti-psychotic Geodon. However, he complained that the medication made him "lock-up" and eat too much. He requested an increase in Cogentin to reduce his side effects of muscle stiffness. Dkt. 175-1, ¶ 28.

On July 25, 2016, Bertsch saw Perry for follow up after he had started his new medications. Dkt. 175-1, ¶ 30; Dkt. 175-1, pg. 52-55. Bertsch noted that Perry exhibited paranoid, grandiose thinking, stating that he believed prison administration and correctional officers were targeting him. *Id.* He stated the prescribed Buspar improved his mood but that he thought the Geodon was making his legs tight. *Id.* He signed a consent for treatment with medications (ziprasidone, buspirone, and benztropine). *Id.* Under the "Allergy" entry on Perry's medical record, it was noted that Perry reported that Haldol "locked body muscles up" *Id.* Bertsch did not interpret Perry's report that Haldol caused his muscles to lock up as an allergy, because muscle stiffness is a common side effect of anti-psychotic medications and can be addressed by additional medications. *Id.*

On August 4, 2016, Perry submitted a RFHC stating that he had reconsidered his refusal to take Geodon and he agreed to remain on the anti-psychotic medication. Dkt. 175-2, pg. 482.

On August 9, 2016, Robtoy saw Perry for temporary mental health placement based on his report to custody staff that he would kill himself if he left his cell. Dkt. 175-6 ¶ 15; Dkt. 175-2, pg. 62. Robtoy noted that Perry presented as paranoid, agitated, suspicious, and seemingly psychotic. *Id.* When she told him that he would be placed in an observation cell until he could be assessed the next day, he began joking and laughing stating that he had no thoughts of suicide. *Id.* Robtoy noted that he had not been taking his medications and would have an involuntary medication hearing soon. *Id.*

On August 10, 2016, Robtoy prepared a notification of involuntary medication hearing. Dkt. 175-6, ¶ 16; Dkt. 175-2, pg. 65. She and staff member David Thomson notified Perry that a hearing regarding the administration of involuntary anti-psychotic medication would be held on August 11, 2016. *Id.* Perry "argued with [her] asking for help to stop this process…" Dkt. 168 pg.

3. Perry asserts that he was not given a copy of notification form to review. Dkt. 168 pg. 3. The defendants contend that Perry tore up the form and refused to sign it. Dkt. 175-6, ¶ 16.

On August 11, 2016, Perry's review hearing was held before the treatment review committee to determine if it was in his best interest to administer involuntary anti-psychotic medication. 175-7, ¶ 11. Dkt. 175-1, pg. 76. Chavez, Sims, Robtoy, and Thomson were present. Rippetoe participated by telephone. *Id.* The report from the hearing states that Perry attended the hearing and voiced his disagreement with involuntary anti-psychotic medication but stated that he had agreed to take his prescribed anti-psychotic medication the night before. *Id.* At the hearing, Perry stated that his concerns for his safety were real and were based on real gang threats. *Id.* He also stated that he believed he was being poisoned. *Id.* He contended that he is allergic to Haldol because it made his muscles lock up and breathing difficult. *Id.* Perry states that "the only thing I got to say was that I'm allergic to Haldol and do not use my criminal case to force medicate me . . . ." Dkt. 197 pg. 15. He also states "I wasn't in that room for 5 minutes before being rushed out and 2-3 minutes of that was all sitting and waiting on Dr. Rippetoe to come over the phone. Dr. Sims never asked any questions nor did anybody else. The only thing that was said was Dr. Sims interrupted me while talking to Dr. Rippetoe trying to win him over and said 'he killed his wife in front of his kid because he believed she was poisoning him.'" *Id.*

During the hearing, Sims presented for discussion the four required questions for forced medication under HCSD 4.10 as follows:

1. "Please summarize the evidence of serious mental illness, including the specific psychiatric disorder thought to be present." Response: the evidence from Perry's medical records including his diagnoses of paranoid personality discord, anti-social personality disorder, anxiety, and depression were noted.

2. "Please explain why the psychiatrist believes that the recommended medication is in the patient's best interest, including specific goals for treatment." Response: Perry's paranoia and agitation are to a degree that it is not safe for him or others for

him to be in general population. Perry has refused his medication stating he does not believe he needs treatment. He has demonstrated violence when paranoid in the past. His current incarceration is for murdering his wife in front of their child because he believed she was trying to leave him. Perry had also reported to mental health staff that he believed she was poisoning him.

3. "Please summarize evidence of grave disability, severe deterioration in routine functioning, or the likelihood of serious harm to self, others, or property of others." Response: Perry is angry about his placement in restrictive housing but has been unable to function in the general population. Since 2014, he has only been able to function in general population for a three-week period. He consistently believes others are persecuting him. He presents as angry, paranoid and agitated. He is frequently in distress over perceived threats.

4. "Please describe what other interventions might serve to treat this patient." Response: No interventions have proved effective without medication to treat agitation and paranoia.

Dkt. 175-7, ¶ 12.

On August 11, 2016, Perry was given an injection of Haldol along with an injection of Benadryl (to counteract potential extrapyramidal symptoms such as muscle rigidity). Dkt. 175-1, ¶ 41; Dkt. 175-2, pg. 86. The nurse noted no complications or distress. *Id.* Perry says he felt tightening in his chest and dizzy. Dkt. 197, pg. 5. That afternoon, he saw Robtoy for his daily suicide monitoring visit. Dkt. 175-1, ¶ 42, Dkt. 175-2, pg 84. Robtoy did not note any signs of a reaction. Dkt. 175-1, ¶ 42, Dkt. 175-2, pg 84.

Perry appealed the decision to subject him to involuntary psychotropic medications. Dkt. 185-1, ¶ 7. As Medical Director of the IDOC, one of Mitcheff's responsibilities was to review involuntary psychotropic medication appeals. *Id.* ¶ 5. Mitcheff reviewed Mr. Perry's appeal and denied it. *Id.* ¶ 12. Mitcheff's only involvement in Perry's claims was his handling of this appeal. *Id.*

<u>Perry's Treatment After the Administration of Haldol</u>

On August 12, 2016, Robtoy saw Perry for daily suicide monitoring. Dkt. 175-6 ¶ 23; Dkt. 175-2, pg. 91. She noted that Perry denied problems or concerns related to receiving the shot of Haldol. *Id.* Perry contends that the Benadryl wore off within 24 hours, which caused his muscles to "lock up." Dkt. 197, pg. 6.

On August 14, 2016, Perry submitted a RFHC stating, "I don't know what's going on with me right now, but Thursday after agreeing to the shot I felt alright. However Sunday morning I started feeling agitated, restless and involuntary muscle spasms, back tight, irritated, intense, anxious, and angry. What is going on? I'm not psychotic nor ever been diagnosed with a psychotic disorder." Dkt. 175-2, pg. 486.

On August 15, 2016, Perry was seen for suicide monitoring. Dkt. 175-2, pg. 101. He was agitated and said he was anxious and had muscle tremors as side effects from an injection. Dkt. 175-1, ¶ 43; Dkt. 175-2, pg. 101, 106. He requested an additional shot to treat the side effects of the medication. *Id.*

Later that day, Perry saw Dr. Mannarino for suicide monitoring. Dkt. 175-1, ¶ 44; Dkt. 175-2, 110. Perry reported that he was suffering from what he believed were side effects from his Haldol injection. *Id*. He reported his muscles were rigid and he was "locking up." *Id*. Dr. Mannarino reported that Perry appeared to be exaggerating these claims and that he was moving around well. *Id.* The defendants contend that Perry reported that he had taken a Haldol pill from another inmate to help him sleep, while Perry denies having done so. *Id.*; Dkt. 196, ¶ 34. Perry threatened to kill himself if he did not get additional Benadryl. Dkt. 175-1, ¶ 44.

Dr. Bertsch also saw Perry on August 15, 2016, for follow-up. Dkt. 175-1, ¶ 44; Dkt. 175-2, 120. Perry said he was experiencing some muscle stiffness and believed that the buspirone was

making him anxious. *Id*. He requested to go back on the citalopram/mirtazapine combination to address his anxiety. Perry signed a consent for treatment with medication form agreeing to medications which included Haldol, citalopram, and mirtazapine. Dkt. 175-1, ¶ 44; Dkt. 175-2, pg. 120, 420. The medical records also reflect that Perry was being provided with benztropine. *Id*. Benztropine, also known as Cogentin, is used to treat symptoms of involuntary movements due to the side effects of certain psychiatric drugs. Dkt. 175-1, ¶ 31.

On August 16, 2016, Robtoy saw Perry for a suicide monitoring visit. Dkt. 175-6, ¶ 25; Dkt. 175-2, pg. 134. Perry admitted making suicidal statements to get more medications (Cogentin and Benedryl). Dkt. 175-5, ¶ 25; Dkt. 175-2, pg. 135-35.

On August 20, 2016, Perry submitted a RFHC stating: "I need to talk to you in regards to these Haldol shots. I am having bad reactions from them. My appetite is not there, my body trembles and shakes, I can't take care of myself cause I'm always sleeping. It is just like a punishment drug for me. I would like to get back on my [Geodon] and prove to you I will take it continuously." Dkt. 175-2, pg. 488.

On August 18, 2016 and August 23, 2016, Perry was seen by Robtoy for suicide monitoring. Dkt. 175-6, ¶ 26-27; Dkt. 175-2, pg. 153, 169. He reported feeling tired and groggy and attributed it to his Haldol injection. He reported some muscle twitching, but Robtoy did not observe it. *Id*. He expressed some paranoia as to prior events, but stated he felt ready to return to the general population. Dkt. 175-6, ¶ 27; Dkt. 175-2, pg. 169.

On August 29, 2016, Bertsch saw Perry. Dkt. 175-1, ¶ 48; Dkt. 175-2, pg. 178. Perry stated that he would like to be removed from his Haldol medication and put back on Geodon. *Id*. He promised that he would take the oral medication. *Id*. He reported that he had recently experienced decreased appetite, depressed mood, claustrophobia, muscle tension and occasional tremors. *Id*.

Dr. Bertsch agreed to decrease the dosage of his Haldol injections. Although Perry reported some of the typical side effects of Haldol, he reported no symptoms of an allergic reaction. *Id.*

On August 30, 2016, Perry submitted a RFHC stating, "I need to speak to Dr. Bertsch in regards to my medication." Dkt. 175-2, pg. 489.

On August 30, 2016, Perry was seen by Robtoy for a suicide monitoring visit. Dkt. 175-6, ¶ 29; Dkt. 175-2, pg. 183. Perry reported no signs of agitation or paranoia and stated he was ready to return to general population. *Id.*

On September 1, 2016, Perry submitted a RFHC stating, "I am having trouble urinating and this has been going on since the Haldol shots. I think it is swelling up my prostrate. I'm asking this to stop and I promise I'll take my [Geodon] on time every time." Dkt. 175-2, pg. 495.

On September 4, 2016, Perry submitted a RFHC stating "I was locked up in a ball on the floor and nobody helped me when I was crying for help." Dkt. 175-2, pg. 490. On September 4, 2016, Perry was seen by nursing staff in response to his complaint that his heart hurt and he believed someone had put something in his food. Dkt. 175-6, ¶ 30; Dkt. 175-2, pg. 191-92. He complained of shortness of breath and muscle twitching. *Id.* Nursing staff did not observe any respiratory distress and his other vital signs were normal. *Id.* A small amount of wheezing and a dry cough were noted. *Id.*

On September 10, 2016, Perry submitted a RFHC stating "I am being forced Haldol shots and I've explained the problems it is giving me such as thoughts of suicide, severe anxiety, extremely lethargic and the only thing Dr. Bertsch did was cut the Haldol in half. I am grieving because this medicine is not for me and I'm still be forced to take it after explaining the problems." Dkt. 175-2, pg. 491.

On September 13, 2016, Robtoy saw Perry for a post-suicide observation release assessment. Dkt. 175-6, ¶ 32; Dkt. 175-2, pg. 197-98. Perry stated he was happy to be going back in general population. *Id.* He continued to complain about being on involuntary medications stating he was experiencing the side effect of shaking of limbs, but this was not apparent to Robtoy. *Id.* He then stated he was embarrassed to be on the anti-psychotic medication because he felt it was obvious to others that he was sedated. *Id.* Robtoy informed him that he could present evidence at his next hearing that he did not believe he required involuntary medication any longer. *Id.*

On September 14, 2016, Perry was seen by Robtoy in response to his health care request stating that his involuntary medications were making him feel suicidal. Dkt. 175-6, ¶ 33; Dkt. 175-2, pg. 200.

On September 16, 2016, Perry submitted a RFHC stating "I need to speak with Dr. Bertsch regarding my medications." Dkt. 175-2, pg. 492. On September 20, 2016, he submitted a RFHC stating "I've been asking to speak with Dr. Bertsch in regards to my meds for over a week and have not seen him yet." *Id.* pg 493.

On September 21, 2016, Perry saw Robtoy in response to his health care request complaining of his medications. Dkt. 175-6, ¶ 34; Dkt. 175-2, pg. 203. Perry presented as highly irritable, paranoid, and convinced that IDOC staff and other offenders were against him. His anxiety, psychotic symptoms, and suicidal ideation were significant and had worsened. However, he requested to speak with psychiatry about reducing the level of his medication again. *Id.*

On September 28, 2016, Perry saw Bertsch for a medication management visit. Dkt. 175-1, ¶ 55; Dkt. 175-2, pg. 207. Perry complained of fatigue and muscle tremors which he attributed to his Haldol injection. *Id.* Perry acknowledged that his paranoia had shown some improvement while on Haldol and he acknowledged he needed medication for his mental problems but stated

that he did not like the way he felt on Haldol. *Id.* Bertsch agreed to restart Geodon, but informed Perry that if he became non-compliant again, the involuntary medications would be restarted. *Id.* Perry signed a consent to medication treatment. *Id.*

On October 25, 2016, Bertsch saw Perry for a medication management visit. Dkt. 175-1, ¶ 56; Dkt. 175-2, pg. 221. Perry reported that his oral medications (ziprasidone, benztropine, citalopram, and mirtazapine) were effective and that he preferred them over his injections of Haldol. *Id.* Perry was seen for mental status evaluations several more times over the next few weeks and appeared relatively stable. Dkt. 175-1, ¶ 56; Dkt. 175-2, pg. 226-34, 243-47. He reported medication compliance and denied paranoia and agitation. *Id.*

On November 23, 2016, Perry was placed back into restrictive housing after he had an altercation with another inmate. Dkt. 175-1, ¶ 57. Perry expressed suicidal thoughts but did not intend to act on them. Dkt. 175-1, ¶ 57; Dkt. 175-1, pg. 252. On November 28, 2016, Perry was seen by Robtoy for a restrictive housing evaluation based on his fight with other inmates. He stated that he wanted protective custody status so that he could return to the general population. Dkt. 175-6, ¶ 35, Dkt. 175-2, pg. 260-61.

On December 6, 2016, Perry was seen by Robtoy for counseling. Dkt. 175-6, ¶ 36, Dkt. 175-2, pg. 267-69. He stated he did not believe he needed to be on any medications, but claimed he was compliant with his current medication. *Id.* Robtoy was concerned about the increase in paranoia and violence and referred Perry for a psychiatric evaluation. *Id*. On December 17, 2016, Perry refused his tele-psychiatry appointment. *Id.* She had no further involvement in Perry's mental health treatment after December 6, 2016. *Id.*

On December 21, 2016, Perry was seen for a tele-psychiatry visit with Rippetoe. Dkt. 175-1, ¶ 59; Dkt. 175-2, pg. 287. Perry stated that he did not need medication, but instead needed

protection as he believed his victim's family was trying to have him killed in prison. *Id.* He believed his food was being poisoned and that inmates with cell phones were targeting him. He felt the Remeron he was taking orally was too sedating. Rippetoe discontinued Perry's Remeron at his request and stated he would discuss further medication with Perry's on-site mental health team. *Id.*

On January 5, 2017, Perry was seen by Chavez for a complaint of shortness of breath. He stated that he had had the problem for years. Dkt. 175-1, ¶ 60; Dkt. 175-1, pg. 291. He was worried he might have mesothelioma because he used to work in factories. *Id.* Perry's physical examination was normal, but Dr. Chavez stated she would request a pulmonary function test. *Id.* On January 19, 2017, Perry refused to take the prescribed pulmonary function test. *Id.*

February 1, 2017 Hearing

On January 23, 2017, Perry was assessed, and his progress reviewed by psychiatrist, Christine Negendank, M.D. Dkt. 175-1, ¶ 60; Dkt. 175-1, pg. 301-304. She noted that Perry was on a low dose of Geodon and did not exhibit or complain of any side effects. *Id.* After reviewing his psychiatric records, she noted that he had been earlier diagnosed as schizophrenic but appeared to have no insight into his mental illness. *Id.* She noted he was placed on involuntary medication in August 2016 based on refusal of food due to fear of poisoning and belief that health care staff were trying to kill him which caused him increased agitation. *Id.* These behaviors led to concern regarding the patient's safety to himself and others. *Id.* Dr. Negendank entered an order recommending continuing involuntary medications. *Id.*

Perry was notified that his involuntary medication hearing would be held on February 1, 2017. Dkt. 175-1, ¶ 62; Dkt. 175-1, pg. 307. Perry stated he wished to attend the hearing and signed the notice of hearing. *Id.* On the morning of February 1, 2017, Perry was involved in a physical

altercation with his cellmate and was placed in restrictive housing. Dkt. 175-1, ¶ 62; Dkt. 175-1, pg. 311-317. He was treated by nursing staff for a laceration to his nose. *Id*. Perry's medical provider recommended that he not attend the involuntary medication hearing that day due to his state of agitation. Dkt. 175-2, pg. 318-19. If an offender's attendance at an involuntary medication hearing "poses a substantial risk of serious physical or emotional harm to self or poses a threat to the safety of others," the offender's presence is not required. Dkt. 175-4, HCSD 4. 10, ¶ 7(f). Perry's restrictive housing placement review noted that Perry continued to suffer from a serious mental illness. Dkt. 175-1, ¶ 63; Dkt. 175-1, pg. 320-21.

On February 1, 2017, Perry's involuntary treatment hearing was held before the medical treatment review committee. Dkt. 175-8, ¶ 20. Sims, Rippetoe, Dr. Samuel Byrd, Brian Mifflin, assisting staff person, Michael Petty, assisting staff person, Lori Cardinal, assisting staff person, Kelly Inda, Mental Health Professional, Dr. Michael Shamalov, psychologist, and Jennie Brooks, doctoral psychology intern were present. *Id.* The committee considered the evidence that Perry was on oral mental health medications with involuntary back-up. *Id.* His pattern has been that when on oral medications symptoms of paranoia and violence return. *Id.* Reference was made to Bertsch's evaluation that Perry's behavior stabilized when he was on involuntary medications. Dkt. 175-1, ¶ 64. Involuntary medication status was unanimously approved by the three members of the treatment review committee: Dr. Sims, Dr. Byrd, and Dr. Rippetoe. *Id.*

Bertsch saw Perry after the treatment committee hearing and informed him that he would be placed back on involuntary medications. *Id.*

On February 2, 2017, Perry submitted a RFHC stating "I was on 25 milligrams of Haldol last time with Cogentin because of the side effects it cause me so I ask that you put me back on 25

milligrams and 2 mg Cogentin please. These Benadryl shots do not work for me and I need Cogentin. I need to speak to Bertsch as soon as possible." Dkt. 175-2, pg. 506.

On February 15, 2017, Bertsch saw Perry for follow up on his medications. Dkt. 175-1, ¶ 66. After renewal of his Haldol injections, Perry reported diffuse muscle stiffness, lethargy and feeling confused. *Id.* He asked to have the Haldol injections stopped and to be placed on Olanzapine (an anti-psychotic used to treat schizophrenia). *Id.* Bertsch decreased Perry's Haldol level and increased his level of Cogentin to address his muscle complaints. *Id.* Perry signed a consent of treatment form dated February 15, 2017, that included consent to treatment with Haldol and benztropine. *Id.*

On February 17, 2017, Perry was transferred to New Castle Correctional Facility. *Id.*, ¶ 67. When Perry arrived at New Castle, his Haldol prescription was discontinued because Haldol was listed as an allergy. Dkt. 196 ¶ 24; Dkt. 175-2, pg. 408.

### III. Discussion

Perry claims that the involuntary administration of Haldol violated his due process rights and amounted to deliberate indifference to his serious medical needs in violation of his Eighth Amendment rights.

A. *Due Process*

Perry contends that his due process rights were violated during the August 11, 2016, involuntary medication hearing because he was not provided with an adequate hearing before he was subjected to involuntary treatment with Haldol.[3]

A prisoner "possesses a significant liberty interest in avoiding the unwanted administration of anti-psychotic drugs under the Due Process Clause of the Fourteenth Amendment." *Washington*

---

[3] Perry does not challenge the February 1, 2017, hearing.

*v. Harper*, 494 U.S. 210, 221-22 (1990). The Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with anti-psychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest. *Id.* at 227.

> First, to administer involuntary treatment the state must find that medication is in the prisoner's medical interest (independent of institutional concerns). 494 U.S. at 227, 110 S.Ct. at 1039. Second, the tribunal or panel that reviews a treating physician's decision to prescribe forced medication must exercise impartial and independent judgment, taking account of the inmate's best interest. *Id.* at 222, 233, 110 S.Ct. at 1036, 1042; *compare id.* at 250–53, 110 S.Ct. at 1051–53 (Stevens, J., dissenting). Third, the prisoner must be able to argue capably before a review tribunal that he does not need forced medication. *Id.* at 233, 110 S.Ct. at 1042. If the state failed to meet these requirements in a particular case, the prisoner could argue that he was denied *Harper's* protections.

*Fuller v. Dillon*, 236 F.3d 876, 881 (7th Cir. 2001) (quoting *Sullivan v. Flannigan*, 8 F.3d 591 (7th Cir. 1993)).

### 1. Prisoner's Medical Interest

The defendants argue that the decision to medicate Perry was based on his medical interest because he was non-compliant with his oral medications and continued to exhibit paranoia and threats of self-harm. Perry argues that he was paranoid because he is a confidential informant and that Robtoy observed other inmates yelling at him. Dkt. 196. Perry concedes that he was non-compliant with his medications but argues that he should have been transferred to a special needs unit, not forced to take Haldol. Dkt. 197 pg. 2-3. Perry also argues that he was paranoid because he was a confirmed confidential informant and that Robtoy observed other inmates yelling at him that he was a snitch.

Here, because it is undisputed that Perry exhibited paranoia and thoughts of self-harm, dkt. 175-2, pg. 62, 473; 175-6, ¶ 15, and was not taking his prescribed medications, the defendants have shown that the decision to medicate involuntarily him was in his medical interest.

### 2. Impartial Decision-maker

Next, the parties dispute whether Perry was provided with an impartial decision-maker. Perry contends that because Robtoy, his therapist, was present at the hearing, he did not have an impartial decision maker. In addressing the hearing procedure in Washington prisons, the Supreme Court found the procedure sufficient because "none of the hearing committee members may be involved in the inmate's current treatment or diagnosis." 494 U.S. at 233. There is no prohibition against the treatment provider's presence at the hearing. It is undisputed that Robtoy was not on the treatment committee who made the decision. There was nothing improper with having her at the hearing.

### 3. Ability to Argue before the Committee

Finally, the parties dispute whether Perry was allowed to argue before the committee. The defendants point to the report of the treatment committee which discusses the testimony that Perry provided at the hearing, including his arguments that the dangers he perceives are real and substantial and that he has "been pronounced 'of sound mind, free of mental disorder.'" Dkt. 175-2, pg. 76. Perry argues that he was not provided with sufficient notice of the hearing and he was rushed out of the hearing before he could complete his statements and that he was not provided with evidence or witnesses and that his assisting staff person did not ask any questions on his behalf.

The parties agree that Robtoy and Thomson approached Perry before the August 11, 2016, hearing to inform him of it. The defendants contend that Perry refused to sign the notification form and tore it apart. Perry disputes that he refused to sign the form or tore it apart and instead contends that he was not given a copy of it. This dispute, however, is immaterial. It is undisputed that Perry

was notified of the hearing before it took place. He thus has not shown that his due process rights were violated based on any alleged lack of notice.

The report of the treatment committee shows that Perry was able to make a statement at the hearing and that statement was recorded. To the extent that Perry states he was unable to present further witnesses or evidence, he has not submitted evidence regarding who those witnesses would be or what that evidence would show. He therefore has failed to show that he was denied witnesses or evidence that would have been helpful to his claim.

Because the undisputed evidence shows that Perry was able to present evidence and argument at the hearing and Perry has provided no evidence regarding any further evidence that he could have presented, his due process rights were not denied.

In sum, the undisputed facts show that the decision to administer Haldol was in Perry's medical interest, his decisionmaker was impartial, and he was allowed to argue against the administration of the drug. Thus, the defendants are entitled to summary judgment on this claim and Perry is not.

B. *Eighth Amendment - Allergy to Haldol*

Perry also contends that the defendants were deliberately indifferent to his serious medical needs because they forced him to take Haldol even though he is allergic to it. Perry argues that the defendants failed to make a proper inquiry into his allergy to Haldol. Dkt. 168, pg 12. He also says he complained of side effects with no relief. The defendants argue that Perry is not allergic to Haldol. They contend that Perry's reporting of symptoms such as his muscles "locking up" is a common side effect of Haldol, but not an allergy. They also argue that he was given medication to relieve the side effects he was experiencing and that no allergic reactions were observed.

Perry's medical treatment is evaluated under standards established by the Eighth Amendment's proscription against the imposition of cruel and unusual punishment. *See Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."). Pursuant to the Eighth Amendment, prison officials have a duty to provide humane conditions of confinement, meaning, they must take reasonable measures to guarantee the safety of the inmates and ensure that they receive adequate food, clothing, shelter, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

"To determine if the Eighth Amendment has been violated in the prison medical context, [courts] perform a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d 722, 727-28 (7th Cir. 2016) (en banc). "[C]onduct is 'deliberately indifferent' when the official has acted in an intentional or criminally reckless manner, *i.e.*, "the defendant must have known that the plaintiff 'was at serious risk of being harmed [and] decided not to do anything to prevent that harm from occurring even though he could have easily done so.'" *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005) (*quoting Armstrong v. Squadrito*, 152 F.3d 564, 577 (7th Cir. 1998)). To infer deliberate indifference on the basis of a physician's treatment decision, the decision must be "'so far afield of accepted professional standards' that a jury could find it was not the product of medical judgment." *Cesal v. Moats*, 851 F.3d 714, 724 (7th Cir. 2017) (quoting *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008)); *see also Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006). *Plummer v. Wexford Health Sources, Inc.*, 609 Fed. Appx. 861, 2015 WL 4461297, *2 (7th Cir. 2015) (holding that defendant doctors were not deliberately indifferent because there was "no

evidence suggesting that the defendants failed to exercise medical judgment or responded inappropriately to [the plaintiff's] ailments"). In addition, the Seventh Circuit has explained that "[a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have [recommended the same] under those circumstances." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). "Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.*

The parties do not dispute that an allergy to medication can be a serious medical need, satisfying the first requirement of a deliberate indifference claim. The parties do dispute however, whether the defendants were deliberately indifferent to Perry's alleged allergy to Haldol.

First, the undisputed evidence shows that Perry is not allergic to Haldol. While Perry complained of side effects from the Haldol injections, there is no medical evidence to support a conclusion that Perry is allergic to it. The listing of Haldol as an allergy in his medical records is based on Perry's self-reporting and there is no evidence that a medical provider has determined that he is allergic to Haldol. It is further undisputed that reported allergies to Haldol are often actually complaints of side effects, including the symptoms Perry experienced – muscle spasms, muscle contractions, and stiffness. Dkt. 175-1, 31. Signs of an allergic reaction would include rash, itching, swelling, difficulty breathing, and severe dizziness. *Id.* While Perry complained of some instances of difficulty breathing and dizziness, those instances were sporadic, and he has not identified a connection between these symptoms and the administration of Haldol and has not identified any other symptoms that would indicate an allergy to Haldol. Similarly, Perry contends that he believes the Haldol injection caused him to have a stroke, but again, he provides no medical

evidence that would support a connection between the administration of this medication and his described symptoms.

Next, while it is undisputed that Perry experienced side effects of the Haldol injections, there is no evidence to support a conclusion that Perry's medical providers were deliberately indifferent to this condition. When Perry was administered his first Haldol injection, he was given a shot of Benadryl with it to counteract any potential reaction or side effects. Dkt. 175-1, ¶ 42; Dkt. 175-2, pg. 78-79. He complained of muscle tremors and/or spasms starting on August 15, 2016, following the first Haldol injection on August 11, 2016. Dkt. 175-2, pg. 101, 106, 486. Perry saw two doctors on August 15, 2016. *Id.* He was provided with benztropine. Dkt. 175-2, pg. 123. He saw Robtoy on August 18 and 23, 2016, who noted that she did not observe the complained-of muscle twitching. Dkt. 175-2, pg. 152, 169. On August 29, 2016, Bertsch agreed to reduce his Haldol dosage, and noted that although Perry reported side effects from the medication, he showed no signs of an allergic reaction. Dkt. 172-2, pg. 178. On September 1, 2016, Perry reported trouble urinating that he associated with the Haldol injections. Dkt. 175-2, pg. 495. But Perry has presented no medical evidence to show a connection between his complaints regarding trouble urinating and the Haldol injections. On September 4, 2016, he submitted an RFHC stating that he was "locked up in a ball on the floor." Dkt. 175-2, pg. 490. He was assessed by nursing staff who did not observe any respiratory distress. Dkt. 175-2, pg. 191-92. On September 13, 2019, he again complained to Robtoy that his limbs were shaking, but she did not observe this. Dkt. 175-2, pg. 197-98. Perry stopped receiving Haldol in October of 2016. Dkt. 175-1, ¶ 56; Dkt. 175-2, pg. 221. But the injections were restarted in Feburary of 2017. After he received Haldol again in February 2017, and again complained of side effects, Bertsch again reduced his dosage and provided benztropine. Dkt. 175-1, ¶ 66.

In other words, Perry complaints of side effects were irregular and inconsistent – sometimes he complained of muscle tremors, sometimes of "locking up," and sometimes of other conditions. Sometimes, he did not complain of symptoms or he indicated he was feeling okay. Dkt. 175-2, pg. 486 (stating that after he first had the Haldol shot he "felt alright" but complaining of current symptoms); Dkt. 175-6, ¶ 29; Dkt. 175-2, pg. 183. (Perry reported no signs of agitation or paranoia and stated he was ready to return to general population.). He was assessed on a regular basis, he had medicine to counteract these side effects, and his Haldol dose was reduced.

The record thus shows that the defendants did not ignore his complaints but assessed them and tried to address them. This is not treatment that is so far afield of accepted medical standards as to show that the defendants failed to exercise medical judgment. *Cesal*, 851 F.3d at 724. Perry argues that the defendants should have considered the provision of other medication or placement in a different unit, but, as discussed above, the decision to administer Haldol to Perry was based on the medical judgment that Perry was a danger to himself and had not been taking oral psychiatric medications that were prescribed to him. Even if other treatment options were available, this does not mean that the defendants were deliberately indifferent to Perry's condition. Finally, the fact that New Castle staff discontinued his Haldol prescription based on the reported allergy to this medication does not mean that the defendants here were deliberately indifferent. *Pyles*, 771 F.3d at 409 (disagreement among medical professionals is not sufficient to show deliberate indifference). Under these circumstances, the defendants have shown that they were not deliberately indifferent in providing Perry with medication to treat his dangerous mental condition even though that medication might have serious side effects.

Based on the undisputed material facts, the defendants are entitled to summary judgment on Perry's Eighth Amendment claim.

## IV. Conclusion

For the foregoing reasons, Perry's motion for summary judgment, dkt. [168], is **denied** and the defendants' cross-motions for summary judgment, dkt. [174], and [183], are **granted**. Perry's motion to deny state defendant's motion for summary judgment, dkt. [222], and motion to reconsider, dkt. [224], are **denied**. In his motion for concernment, Perry expresses some concern regarding the summary judgment filings. That motion dkt. [233], is **granted** to the extent that the Court has considered all of Perry's evidence and arguments in ruling on the motions for summary judgment. Judgement consistent with this ruling shall now issue.

**IT IS SO ORDERED.**

Date: 3/12/2019

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

Distribution:

JASON SETH PERRY
138925
WABASH VALLEY - CF
WABASH VALLEY CORRECTIONAL FACILITY - Inmate Mail/Parcels
Electronic Service Participant – Court Only

Jeb Adam Crandall
BLEEKE DILLON CRANDALL ATTORNEYS
jeb@bleekedilloncrandall.com

Ryan J. Guillory
OFFICE OF ATTORNEY GENERAL CURTIS HILL
ryan.guillory@atg.in.gov